Filed 12/2/21  In re Z.H. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Z.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S.H.,<br><br>    Defendant and Appellant. | G060406<br><br>(Super. Ct. No. 21DP0555)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant, S.H.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

S.H. (Mother) appeals from the juvenile court's jurisdiction and disposition rulings removing her son from her custody. (Welf. & Inst. Code, §§ 300, subds. (b)(1) & (g), 361, subds. (c)(1) & (c)(5).) The juvenile dependency petition underlying this case was precipitated by a report the child witnessed a domestic violence incident that occurred between Mother and her boyfriend. While Mother contends there was insufficient evidence to justify the court's rulings, the record demonstrates substantial evidence supporting the rulings; we affirm.

I

FACTUAL AND PROCEDURAL HISTORY

A. *Investigations Leading to the Child's Detention*

While living with her seven-year-old son Z.H. in May 2021, a report was made to Child Protective Services that days earlier, on April 27, while Z.H. had been home, Mother had been involved in a domestic violence incident with her boyfriend, Kevin.[1] It was reported that Mother disclosed being choked and left with marks, bruises, and a black eye. It was also reported domestic violence between Mother and Kevin had been ongoing since 2014 and that Mother disclosed she was working as a prostitute and Kevin was her pimp.

On May 11, police officers and social workers of the Orange County Social Services Agency (SSA) visited Mother's residence—an apartment where, according to Mother, she had been renting a bedroom from her aunt for a few months. At first, only Z.H. and Kevin were at the residence, where social workers observed a strong order of marijuana as well as marijuana paraphernalia on the kitchen island within Z.H.'s reach. Mother arrived later and stated she smoked marijuana in her bedroom, possessed a medical prescription for marijuana, and stored it on a high kitchen shelf or in her bedroom closet, away from Z.H.

---

[1] Mother was enrolled in services at the time of the report for domestic violence abuse based on a past incident with a prior boyfriend.

A social worker separately interviewed Z.H., Kevin, and Mother. Z.H. stated he had recently witnessed Kevin—choke his mother.[2] The child stated that after the violence was over, he gave Mother a hug and asked if she was okay. Z.H. also stated that, about two years earlier, he had witnessed Kevin "'tussle'" with his mother and pull her hair out. Z.H. also stated that, around the same time, Kevin punched him in the chest after doing something "really bad." Z.H. said he had not been injured, was not afraid of Kevin, and was only afraid of Mother when she was going to "spank" him. When asked what he would want through a magic wand, the child said he would want to be rich and for his parents to stop fighting. Z.H. said he only knows one kind of drug and when asked to identify it, the child smiled and pointed inside his home where the marijuana odor had been observed; he would not speak on the subject any further.

Kevin denied having any substance abuse issue but admitted he smoked marijuana and claimed his last arrest had been for marijuana in 2016. Kevin stated he and Mother had been together on and off since 2010, denied domestic violence had ever occurred between them, and claimed the April 27 incident had only consisted of him and Mother holding each other back from leaving the apartment. Kevin explained he is not Z.H.'s biological father but counted the child as his own, along with his two biological children who lived with their mother in Los Angeles County. Kevin stated he had only spanked Z.H. twice in his life, with a flat hand on the child's buttocks, and denied there had been any other instances of physical discipline.

Mother claimed her most recent arrest had been for prostitution in 2016 but that she no longer engaged in that type of activity. She denied Kevin was her pimp and explained the two had been in an "on and off" relationship since 2010. Mother claimed she was pursuing a career in cosmetology that Kevin was supportive of, that she felt safe with him, and was the happiest she had ever been in her life. Mother asserted Z.H.'s

---

[2] Z.H. at times referred to Kevin as his father or Bobby.

biological father had been a random person, that his name was unknown, and that Kevin was the only father Z.H. had ever known. Concerning the April 27 incident, Mother claimed she sustained a mark on her face but thought she may have caused it herself during the "'tussle'" with Kevin. She denied Kevin struck or choked her and asserted that Kevin had never abused or physically disciplined Z.H. When the social worker communicated that Z.H. had reported witnessing Kevin choke her, she denied the child witnessed the incident, claiming she had checked after the incident and had seen the child still napping. Mother confirmed she did not call the police after the incident and refused to seek a restraining order against Kevin.

The SSA's independent investigation showed both Mother and Kevin misrepresented the extent of their criminal histories during their interviews. Kevin's criminal history included, among other matters, a misdemeanor conviction for cruelty to a child.

On the day of their interviews, Mother and Kevin signed a safety plan with the SSA that included Mother's agreement to continue receiving domestic abuse services; the next day, Mother told a social worker she was ending her participation in the services and would not participate in additional family services offered by the SSA. Mother claimed there was no need because her domestic life was going well, and that the April 27 incident had occurred "mainly because of her" and did not happen as she had initially reported it. When the social worker expressed concern that Mother could be minimizing the danger Z.H. faced by being left alone with Kevin, Mother responded Z.H. was safe and repeated that Kevin would never harm the child. Mother also maintained Z.H. had not witnessed any past domestic violence incidents and Mother denied Kevin previously may have punched Z.H. in the chest. Mother added that as the social worker probably had not grown up like Mother, who had been abused as a child, the worker did not understand Mother's life.

That same day, an SSA social worker spoke with a domestic violence advocate who previously had spoken with Mother. The advocate stated Mother had disclosed having a history of domestic abuse, including one where she was choked, pinned to the wall and hit by Kevin, resulting in a black eye. The advocate was concerned Mother did not fully understand how Z.H.'s experiences with domestic violence could impact the child's safety and well-being and reported that Mother disclosed she was still an active sex worker and would leave Z.H. with babysitters who the advocate believed were not well known by Mother.

The next day, an SSA social worker spoke with Kevin's parole officer, who communicated that Kevin was on interstate parole which prohibited Kevin from leaving Los Angeles County, consuming marijuana, and contacting Mother, his pimping victim. Although the officer initially stated that Kevin could be sent to jail based on the SSA's information, the officer later reported Kevin would not be arrested and his parole term would be completed in the next few days.

The following day, the SSA applied for a protective custody warrant for Z.H., which the juvenile court authorized. When the police and SSA social workers arrived at Mother's residence with the warrant, the odor of marijuana as well as paraphernalia on the kitchen island were again observed. Mother "grabbed the child by the hand and started to tell him [the SSA social worker] wanted to take him away because [the social worker] didn't believe the child was safe with" Mother. When the social worker advised Mother the communication to Z.H. was inappropriate due to his age, Mother invited the worker to discuss the concerns in front of Z.H.

B. *Postdetention Events*

SSA filed a petition on May 24 alleging, among other things, that Mother had failed to adequately protect Z.H. from domestic violence and failed to provide regular care for Z.H. due to substance abuse. At the hearing the following day, Mother

generally denied the allegations, stated she was willing to participate in services, and denied she previously had declined participation.

The juvenile court amended and sustained the petition. The court commended Mother for enrolling in services and set the case for a combined jurisdiction and disposition hearing for three weeks later. Z.H. was placed with foster parents and the following week, an SSA social worker met with Mother, who reported Kevin had left her so she could reunify with Z.H., but also that she intended to reconcile with Kevin in the future. Mother participated in developing an initial case plan she signed, agreeing to participate in counseling, a domestic violence program, a parenting program, and substance abuse treatment. Upon being reinterviewed at his foster home, Z.H. denied witnessing any domestic violence, having any knowledge of drugs, and even knowing who Kevin was.

C. *The Combined Jurisdiction and Disposition Hearing*

The juvenile court conducted its combined jurisdiction and disposition hearing on June 16 and June 17. Senior social worker Stephanie De Luna of the SSA testified that although Kevin no longer lived at Mother's residence, De Luna believed "there [was] still a significant threat to the child being placed in [M]other's care," because of further exposure to domestic violence, primarily because of Kevin, and a risk of Z.H. consuming marijuana because of Mother's substance abuse.

Mother testified the April 27 incident occurred when Kevin had been packing so he could leave Mother and she "egg[ed]" him on by helping him fold his clothes. Mother testified Kevin put his right hand around Mother's neck and stated it was "uncomfortable" but denied experiencing pain or difficulty breathing. Mother maintained Z.H. had not witnessed the incident and testified there had only been one prior incident of domestic violence with Kevin, about two and a half years earlier, when Z.H. had been with a babysitter.

6

Mother testified Kevin had moved out of her home the day after Z.H. was detained by the juvenile court and that she had not had any contact with him in the intervening four weeks. Mother testified it "might be best for [her and Kevin] not to reconcile." She explained she previously had expressed a desire to reconcile with Kevin because he was the only father Z.H. knew and she wanted the child to have a father in his life. When Mother's counsel asked whether Mother had "requirements for [Kevin] to complete before" considering reconciliation, Mother stated she would require Kevin to complete a domestic violence class before even speaking and "possibly, anger management."

Mother now admitted she had previously declined the SSA's offered family services in Orange County but explained she had subsequently changed her mind on the issue. Mother testified that because of four classes she had attended to that point in time—three personal empowerment classes and one counseling class—she had learned "telltale signs" of when a domestic violence incident might occur and had a plan for how to leave with Z.H. if a risk arose. Mother also testified she knew how to defend herself and would notify law enforcement if an incident occurred.

Although Mother acknowledged that domestic violence could generally pose a risk to Z.H., she maintained Kevin did not pose a risk because he had "never put a hand on" the child. Mother also asserted her marijuana use did not impact her ability to safely parent Z.H. because she only smoked it for insomnia when Z.H. was sleeping. She asserted the physical presence of marijuana alone did not pose a risk to Z.H. because she could keep it locked away from him. Mother explained her previous report of smoking "six blunts a day" was an exaggeration, but admitted she had smoked recreationally during the daytime.

During oral arguments, SSA's counsel asserted Mother's story had "changed after the consequences set in" and that she was still minimizing the extent of the domestic violence incident. Z.H.'s counsel joined the SSA's comments and argued

7

Mother did not appreciate the risk of harm that existed based on the discrepancies between the child's accounts of what he observed and Mother's denial of the points. Z.H.'s counsel also argued Mother did not understand the risks posed by her marijuana use, pointing out Mother had not articulated a safety plan for an emergency situation that could arise while she was under the influence of marijuana, other than dialing 911. Counsel acknowledged it was clear Mother loved Z.H. but asserted she was only beginning to learn about the risks her lifestyle posed for Z.H.

Mother's counsel asserted Mother had made "significant progress" since the SSA's investigation had started five weeks earlier, pointing out Mother had adjusted from smoking marijuana in her living room to her bedroom and was planning to get a lockbox for her marijuana and paraphernalia. Mother's counsel analogized to this court's recent opinion in *In re Ma. V.* (2021) 64 Cal.App.5th 11 (*Ma. V.*) to assert her history of domestic violence and marijuana use were not sufficient to justify the juvenile court's exercise of jurisdiction or a dispositional order to remove custody of Z.H. from her. Mother's counsel admitted Mother had initially refused offered services but asserted Mother had since then credibly committed to participate, showing Mother would "put [Z.H.] first."

D. *The Juvenile Court's Jurisdiction and Disposition Orders*

The juvenile court took jurisdiction under Welfare & Institutions Code section 300, subdivisions (b)(1) and (g)[3] and entered a dispositional order removing custody of Z.H. from Mother, under section 361, subdivisions (c)(1) and (c)(5). The court explained its "paramount concern" was the risk of domestic violence posed by Mother's willingness to reunify with Kevin, who the court found was an "abusive, violent individual" based on his history. The court found there was insufficient evidence demonstrating Mother's recently claimed willingness to protect Z.H. from Kevin.

---

[3] All further undesignated statutory references are to the Welfare and Institutions Code.

8

The court distinguished *Ma. V.*, stating the precipitating domestic violence incident in this case was still "extremely fresh" and explained it was not Mother's status as a domestic violence victim that concerned the court but instead evidence showing she refused to keep Kevin out of her life in order to protect Z.H.

The court's dispositional order set a six-month status review hearing and continued Z.H.'s placement with foster parents, family reunification services for Mother based on her case plan, and Mother's visitations with Z.H. Mother timely appealed.

II

DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's jurisdiction and disposition orders, arguing the SSA failed to prove a sufficient risk of physical harm to Z.H. because the evidence showed the child lived in a loving home where "all his needs were being met." Mother additionally challenges the dispositional order, asserting the court failed to consider a less drastic measure than removal of the child from Mother's custody.

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)

A. *Substantial Evidence Supports the Juvenile Court's Jurisdiction Over Z.H.*

A juvenile court may exercise jurisdiction over a child if a preponderance of the evidence shows a parent's failure or inability to adequately supervise or protect the child results in a "substantial risk" the child would suffer "serious physical harm or illness." (§ 300, subd. (b); see *In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1211.)

9

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

"Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) A "court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) "Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection." (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.)

Substantial evidence supports the juvenile court's conclusions that, at the time of the court's decision, Z.H. faced a substantial risk of suffering serious physical harm because Mother's relationship with Kevin remained unresolved. The record contains evidence Kevin had choked Mother in Z.H.'s presence and that, two years earlier, Kevin had punched Z.H. in the chest when the child was five years old. Critically, the risk demonstrated by Kevin's past violence was compounded by the fact that Mother denied that Kevin posed a risk to Z.H., denying the child had witnessed or incurred any past violence, in the face of evidence by Z.H. himself to the contrary. (See *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026 [in evaluating current risk, court should consider evidence of parent's current understanding of and attitude toward the past conduct that endangered a child].) In addition to Mother's minimization of the domestic violence risk, Mother's assertion that the presence of marijuana in her home did not pose a risk to Z.H. because she kept it away from him, despite the SSA's observations of paraphernalia within the child's reach both times they entered Mother's home before the child was detained, demonstrates support for the juvenile court's findings.

As she did in the juvenile court, Mother relies on *Ma. V., supra*, 64 Cal.App.5th 11, to argue the juvenile court's orders amount to the court punishing her for being a victim of domestic violence. Her argument is not persuasive, however, because *Ma. V.* is factually inapt. There, a mother's three children were detained after the mother and her boyfriend argued while in a car with the eldest child, resulting in the boyfriend putting the mother in a headlock and choking her. The boyfriend was arrested but, after the mother did not renew an emergency restraining order, he returned that same month and got into another altercation with the mother, resulting in his rearrest. (*Id.* at pp. 14-15.)

The mother in *Ma. V.* was dealing with mental health issues, including posttraumatic stress disorder, and consumed marijuana based on a medical prescription. (*Ma. V., supra*, 64 Cal.App.5th at pp. 16-17.) Due to the COVID-19 pandemic, 10 months elapsed between the initial detention of the mother's children and the juvenile court's jurisdiction and disposition rulings. (*Id.* at p. 23.) By the time of the rulings, the SSA in that case did not dispute the relationship between the mother and her boyfriend had ended. (*Id.* at p. 22.) Notwithstanding, the court concluded the "old issue" was still relevant to its decision to exercise jurisdiction over the mother's children and remove them from the mother's custody. (*Id.* at pp. 22-23.)

A panel of this court reversed and remanded, holding that "stale evidence was insufficient to support the [juvenile] court's jurisdictional findings" and disposition order. (*Ma. V., supra*, 64 Cal.App.5th at p. 22, 25.) The panel noted a "troubling trend" of cases where, "[e]ven after a mother manages to distance herself from the abuser . . . SSA and the juvenile court continue to use the history of domestic violence as a basis to remove the children." (*Id.* at pp. 25-26.) The *Ma. V.* court explained the juvenile court had erroneously "focused on old issues that were resolved by the time of the jurisdictional hearing." (*Id.* at p. 21.)

11

Both the timing circumstances and undisputed end of the dangerous relationship in *Ma. V.* are absent here. Mother's domestic violence incident had occurred a mere six weeks before the challenged orders, as opposed to the 40 weeks that elapsed there. Equally important, while "[i]t was undisputed [in *Ma.V* that] the perpetrator of the violence against the [m]other . . . had left the family home and [the m]other had ended her relationship with him" (*Ma. V., supra*, 64 Cal.App.5th at p. 22), in this case the juvenile court explicitly found the relationship between Mother and Kevin unresolved and substantial evidence supported that conclusion. The record shows the April 27 domestic violence incident was still "extremely fresh" at the time of the court's June 17 decision, particularly because both Mother and Kevin had reported their relationship as being "on and off" over the past decade. In sum, there was ample ground for the court to conclude that 27 days since last speaking did not indisputably show the relationship had concluded.

While extremely valuable, Mother's participation in her case plan services does not alter our conclusion that substantial evidence supports the juvenile court's jurisdictional findings. It was well within the juvenile court's prerogative to assess the credibility behind Mother's assertions about the nature of her relationship with Kevin, including her testimony that she would not reconcile with Kevin unless he completed some counseling. (*R.T., supra*, 3 Cal.5th at p. 633.) Particularly given that Mother recanted the April 27 incident during the SSA's investigation and took contradicting positions about whether she initially refused services, it was reasonable for the court to severely discount Mother's claimed intentions about what boundaries she would set to continue a relationship with Kevin. Mother's beginning stages of participation provide no ground to reverse the court's jurisdictional findings.

12

B. *Substantial Evidence Supports the Juvenile Court's Disposition Order Removing Custody of Z.H.*

For dispositional orders, section 361, subdivision (c), provides in relevant part that a juvenile court can order a child removed from the physical custody of his parent where clear and convincing evidence shows "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without" removal. The SSA is held to a heightened clear and convincing evidence burden of proof "'in light of the constitutionally protected rights of parents to the care, custody and management of the children.'" (*In re Ma. V., supra*, 64 Cal.App.5th at p. 24.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

The heightened standard of proof for the juvenile court's disposition order does not provide a ground for reversal. The same substantial evidence supporting the court's jurisdictional findings, discussed above, also supports the court's disposition order because the circumstances of Mother's unresolved relationship with Kevin sufficiently showed a substantial danger to Z.H.'s physical well-being that justified his removal from Mother's custody.

Finally, Mother contends we should reverse the juvenile court's disposition order based on section 361, subdivision (c)(1)'s requirement that a court must find no reasonable means of protecting the minor other than removal before ordering it. According to Mother, the court failed to "consider[] less drastic measures" such as "in home parenting" or "regular check[s]" by an SSA social worker before ordering Z.H. removal from Mother's physical custody.

13

Mother's contention on the point amounts to a request for us to reweigh the evidence and reach a conclusion different from the juvenile court, an argument that ignores the respective roles of the juvenile court and this court. (*R.T., supra*, 3 Cal.5th at p. 633; see *In re E.E.* (2020) 49 Cal.App.5th 195, 217 ["'[t]he trial court is in the best position to determine the degree to which a child is at risk based on the assessment of all the relevant factors in the each case'"].) Our review of the reporter's transcript for the combined jurisdiction and disposition hearing shows that before the juvenile court rendered its dispositional decision, Mother's counsel requested that Z.H. be released outright to Mother or, in the alternative, conditionally released to her.

Given this record, we conclude substantial evidence supports the juvenile court's implied finding that no reasonable means of avoiding removal existed. (See *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83-84 [for determination in another stage of a juvenile dependency case, substantial evidence supported implied finding].) In addition to the substantial evidence supporting the court's finding of danger posed by Kevin's abusive and violent nature, the record showed Mother was in a state of transition in her life, focused on school that understandably required her energy and time. Indeed, the SSA's jurisdiction and disposition report documented that Mother had recently missed attending Z.H.'s doctor's appointment due to her school schedule. Based on that evidence, it was reasonable for the court to conclude that Mother, a single parent who told the SSA she did not want her family members finding out about this case, was not in a position to protect her child from the risk the court found.

III

DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

ZELON, J.*

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.